[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**RECEIVED**

EL NOV 18 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Ashley Dominique Hickman )
)
)
)
)
)
(Name of the plaintiff or plaintiffs) )
)
v. )
Target Corporation )
)
)
)
)
)
(Name of the defendant or defendants) )

CIVIL ACTION

1:20-cv-06987
Judge Charles P. Kocoras
Magistrate Judge M. David Weisman

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**

1. This is an action for employment discrimination.

2. The plaintiff is Ashley Dominique Hickman of the county of Cook in the state of Illinois.

3. The defendant is Brian Cornell, whose street address is 1000 Nicollet Mall, (city) Minneapolis (county) Hennepin (state) Minnesota (ZIP) 55403 (Defendant's telephone number) (612) – 304 - 6073

4. The plaintiff sought employment or was employed by the defendant at (street address) 2656 North Elston Avenue (city) Chicago (county) Cook (state) IL (ZIP code) 60647

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5.  The plaintiff [*check one box*]

  (a) ☐  was denied employment by the defendant.

  (b) ☐  was hired and is still employed by the defendant.

  (c) ☒  was employed but is no longer employed by the defendant.

6.  The defendant discriminated against the plaintiff on or about, or beginning on or about, (month) 01 , (day) 29th , (year) 2020 .

7.1  *(Choose paragraph 7.1 or 7.2, do not complete both.)*

  (a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☐ *has not* ☒ *has* filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

  (i)  ☒ the United States Equal Employment Opportunity Commission, on or about (month) 08 (day) 27th (year) 2020 .

  (ii)  ☐ the Illinois Department of Human Rights, on or about (month)_____ (day)_____ (year)_____ .

  (b) If charges *were* filed with an agency indicated above, a copy of the charge is attached.  ☒ YES.  ☐ NO, **but plaintiff will file a copy of the charge within 14 days.**

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2  The defendant is a federal governmental agency, and

  (a) the plaintiff previously filed a Complaint of Employment Discrimination with the defendant asserting the acts of discrimination indicated in this court complaint.

2

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

☐     Yes (month)_____ (day)_____ (year) _____

☐     No, did not file Complaint of Employment Discrimination

(b)    The plaintiff received a Final Agency Decision on (month)_____
(day) _____ (year) _____.

(c)    Attached is a copy of the

     (i) Complaint of Employment Discrimination,

     ☒ YES     ☐ NO, but a copy will be filed within 14 days.

     (ii) Final Agency Decision

     ☐ YES     ☐ NO, but a copy will be filed within 14 days.

8.    *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

     (a) ☐    the United States Equal Employment Opportunity Commission has not issued

          a *Notice of Right to Sue.*

     (b) ☒    the United States Equal Employment Opportunity Commission has issued a

          *Notice of Right to Sue*, which was received by the plaintiff on
          (month) O8    (day) 27th    (year) 2020    a copy of which
          *Notice* is attached to this complaint.

9.    The defendant discriminated against the plaintiff because of the plaintiff's [*check only
those that apply*]:

     (a) ☐   Age (Age Discrimination Employment Act).

     (b) ☒   Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

3

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c)☐ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d)☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e)☒ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f)☐ Religion (Title VII of the Civil Rights Act of 1964)

(g)☐ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983). No

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant [*check only those that apply*]

(a)☐ failed to hire the plaintiff.

(b)☐ terminated the plaintiff's employment.

(c)☒ failed to promote the plaintiff.

(d)☐ failed to reasonably accommodate the plaintiff's religion.

(e)☐ failed to reasonably accommodate the plaintiff's disabilities.

(f)☒ failed to stop harassment;

(g)☒ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h)☐ other (specify):_____

_____

4

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

_____

13. The facts supporting the plaintiff's claim of discrimination are as follows:

I've attached my hospital discharge paper, I've experienced time theft. The article is printed and attached. Brian Cornell has to confirm the decision of my transfer, clarity of the team members decision to deny them. Most importantly the truth has to be revealed to the Judge regarding of my issues.

14. **[AGE DISCRIMINATION ONLY]** Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15. The plaintiff demands that the case be tried by a jury. ☒ YES ☐ NO

16. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ☐ Direct the defendant to hire the plaintiff.

(b) ☐ Direct the defendant to re-employ the plaintiff.

(c) ☐ Direct the defendant to promote the plaintiff.

(d) ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☐ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☐ Direct the defendant to (specify): _____

_____

5

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

_____

(g) ☒ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☒ Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

_____

(Plaintiff's name)

Ashley Dominique Hickman

(Plaintiff's street address)

616 East 90th Place

_____

(City) Chicago _____ (State) IL _____ (ZIP) 60619

(Plaintiff's telephone number) (708) – 970 - 6215 _____

Date: _____

6

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Ashley Dominique Hickman

### Statement of claims

Target Near North Store Director, Lee singles me out every year compared to his other employees. Each year I've worked at Target I noticed his department managers and team leaders tried to help him fire and push me out of my job. I felt Lee wrath towards me after we had a very intense discussion in the spring of 2019. Since that day, I experienced an excessive amount of work harassment and mistreatment from all of my managers and Team Leaders. I want to bring this point to the court's attention, that Retail can open the door to racist employees. It could give them the opportunity to treat an individual or a particular group of people differently from one another. Managers can easily abuse their power deciding an approval for requests like tax exempt, transfers, schedule and department changes; including requesting paid and unpaid time off.

Near North managers took advantage of me as a part time member for 3 years. They made it impossible for me to benefit from the Target's flexibility policy and pay increase. The team leaders deprived me the right to request, a preferred schedule and more hours using the change availability form. I claim that I experience time theft and my time was given to a favored team member(s). My disciplinary actions are unfair, they seem more like personal punishments. Lee chooses to promote employees who look different than me each year. I am just as good as they are or better. The team members denied my transfer out of anger. They used my coachings as a barrier, so that the only option they suggested was to resign and then reapply. If the courts determine their reasons to be invalid than their actions should be considered discrimination due to skin color and race.

Store Director Lee, Bill, Vice President of Assets and Protection, Ingrid, the District Manager of Human Resource, and all of the Team Leads including the team member's that work in administration were framing me for fire. They all need to be confronted by Brian Cornell and the Judge. I grew anxious on the inside because I noticed some of my coworkers and team leaders ignored my presence for a little while in January. I fear that violence could escalate from this toxic work environment which is why I denied the investigation from the EEOC and requested a Right to Sue letter to ensure that safety is a priority. Target integrity hotline is incompetent. It doesn't specify who will investigate the reports and mine went unnoticed.

The Human Resource of Operational Center is an unreliable source of information and it has no number to leadership, but it confirmed a few things. Hours are based on the sales of the store therefore, employees can work a maximum of 60 hours in a work week and the store hours can be reduced to part time. Supervisors and Store Directors can approve transfers. When I explained my situation to the operators, they advised me to talk to my supervisors and make a report. The operators also said that the approval of a transfer is up to the discretion of the store manager. I felt hopeless because my supervisors were the cause of my frustrations and so were the operators. My supervisors claimed to have nothing to do with my transfer being denied.

I ask the Judge to support me in my case by answering a few perplexed questions because Target Corporation is inaccessible to certain employees and I got turned around when I took a flight to headquarters. My cases were denied constantly because lawyers weren't interested in helping a working American, they wanted money. They also undermined my issues because I was a part time. I couldn't get past the phone call allowing potential clients to express themselves in 20 minutes before they denied my case. Therefore concerns turned into resentment. Target Corporation did not specify for employees to abide by store policies which leads me to ask, was I the only one disciplined for exceeding Target Near North's attendance policy limit? Better yet, am I even supposed to be penalized for being sick? How are the managers distributing hours and how come I receive the least hours amongst my team members? Transfers are a benefit because I could have relocated and applied for a different position. Am I the only one whose transfers didn't get approved? What is the purpose of the Change availability form if I can't

request more hours? Most importantly, why couldn't I use my personal time to cover my late ins instead of being reprimanded? Could employees request a transfer immediately after applying to a different store? I really need the Judge to investigate my coachings to determine whether they were deserved or even valid? I've worked at Target for 3 years, should I have a pension? My last check was only $850. I believe I'm worth more. What are the responsibilities of Bill, Ingrid, and Lee?

## Retaliation

In spring of 2019. I asked Administrative support team member Myra, to request a meeting with Lee once he returned from his vacation. I asked her for his email address and she wasn't allowed to give it to me. When he returned he asked to speak to me and as soon as I sat down, Lauren joined the conversation. Lauren was the Human Resource manager my first two years at Target Near North. The discussion was heated right away. My intentions were the same as the first meeting. I wanted better training, more support from the supervisors, and a better rotation of employees meaning there needs to be more people scheduled in that department, roughly 5-6 employees throughout the entire workday. To add, I wanted to complain about Priscilla's disrespectful demeanor and aggressive tone towards me. Lee was very abrupt. He continuously cut me off. He questioned the security of my job. He asked if retail was the right industry for me because this was my second time in his office. He considered our conversations a complaint instead of a caring employee who wanted to protect Targets assets and merchandise. Lauren and Lee made it very clear to me that employees working in self checkout are going to be responsible for merchandise stolen and any incidents that happen in the work area instead of security. Lauren blamed the employees for standing around which means more guests were able to commit dishonest actions. For instance, she said she once walked by self checkout and the line was backed up to the beauty department and she looked over and saw co-worker Rochelle and a few others talking. Instead of scheduling and training more employees they rather have us walk around the guest continuously or accuse us of standing around. Lee mentioned that he didn't have enough budget to hire more staff. I do not agree or believe this statement. The budget for Target Near North can be confirmed by CEO Brian Cornell.

Our previous conversation Lee wanted me to rely on Portia, a long time employee but I wouldn't because she acted as if she didn't know much as well. We are always struggling. It would have been best to ask Lee and former Assets and Protection manager, Kasey. I would like to point out that Self checkout is a very hectic work environment at Target Near North. There are 12 registers and after four o'clock Lee only schedules two employees to monitor all 12 registers and guests until the store closes. I met Vice President of Assets and Protection, Bill, a year and a half ago working a shift in self checkout. He greeted all of us. He implemented a new strategy. The new strategy aimed to eliminate dishonest actions from the guest such as stealing. Bill placed four red target circles in self checkout, two on each side. The employees are supposed to stand next to the red circles and assist the guests. At first it seemed like it would work until the team leads began pushing us around and leaving one to two people in self checkout until closing. I noticed some discrepancies and I started to feel trapped.

Shift managers are told to not support employees in working self checkout. We have to distribute our breaks. None of them are scheduled to work there. They will not send another employee for assistance during a sudden "rush". During my conversation with Lee he stated he wasn't going to hire or schedule more employees after 4pm. I questioned why because self checkout is constantly busy and overwhelming especially for 1 or 2 employees. Lee blamed it on his personal preference and budget. He also stated we couldn't shut down 6 registers until 10pm. This made no sense. One person can only handle 3-4 registers at a time. Former employee, Sherly left Target after 4 years because she felt stressed. She was pushed around in self checkout until she found another job. She was also African American. After she walked out, Amy trained me in Self checkout. Before Sherly left Amy denied me the opportunity to be trained in Guest Service and other work areas. This was suspicious to me.

After my conversation with Lee I noticed that my hours decreased after Target corporation raised their employee wages to $13 an hour in June of 2019. I averaged at least 6.5 hours working at the

checklanes and 7.5 hours working in self checkout. After our conversation, I noticed he shortened my hours in self checkout and days. My checks for June and July of 2019 were the most $480.00.

In August Lauren humiliated me in front of a few co workers. My pants were soaked from the rain. I walked into work one early morning asking a few employees if they could requisition a pair of pants because I was low on money. I only had bus money and lunch money for work. I asked Lucy. She said someone monitoring the front lines should "do something for me". I clocked in and walked to the front lanes and saw Lauren, she was monitoring the Guest Advocates. When I asked if she could requisition me a pair of pants her response was " we don't do that anymore ". She then told me to ask Felita. Felita is a shift manager. She simply responded the same way and was caught off guard that I asked her and not Lauren. Co worker Judy noticed my pants were wet and told me to ask for a pair of pants. I mentioned to her that I did and they both denied me. A few moments later I asked again and Lauren said she would get it for me and I told her I would pay her back that Thursday because we would get paid Friday. I have an early direct deposit with PLS. She finally said go and grab the pants, but I felt humiliated and embarrassed. I believe that there is a budget for struggling employees and I am not sure why she denied me. This has happened to me before. I got caught and in a severe thunderstorm and Amy did it for me with no problem. The leadership at Target Near North is very manipulative.

I made a mistake in August as well. I came to work two hours before my shift started. That's normal for me. Although I had been there I clocked in an hour later. I was eating and listening to music on her phone. When I clocked in I immediately walked to the sales floor and there was felita and Portia waiting for me. Portia was waiting for me to clock in so that she could go to her work area, Guest Service. I apologized to Felita and Portia said, "Ashley, you are not perfect". I was confused by her reaction and response. The point is why are they waiting for me? There are so many employees that it seemed ridiculous to wait on me. I asked Myra if she could correct my time punch and she did. The date and time should be in the system and the courts can review cameras. The two team members could have revealed something on camera. It also showed me my team members are watching me. All of the team members have abused their breaks and this was a mistake.

The last two weeks of August my oldest sister and I were fussing back and forth. She was fired and was two months behind rent. I wasn't aware of the past due payments and did not want to be forced to pick up the slack. The arguments almost got physical and she wanted me to leave her home and my oldest sibling, Carrod offered me to stay with him in Aurora, IL. He promised to allow me to save my money for an apartment. I wanted to transfer to an environment that distributed decent hours so I can afford my own independence and a reasonable commute to work. Near North's Human Resource manager, Catherine told me the decision of a transfer is made by the manager of the store of my request. Catherine told me the store manager was going to access the last 90 days of my attendance, all of the written documentation, and I needed to tell them where I was trained.

I contacted Near Aurora supervisor, Kathy early September. I opened up to her about my struggles at home, the importance of a shorter commute and unfair coachings. On September 19th of 2019 Catherine told me my transfer was denied. She stated that my attendance in the months of June and July combined looked unreliable because I had a few late in's and call offs. I suffered from severe sinus infections. My store had coached me for exceeding their call off limit for employees, but I'm unsure if all employees are receiving verbal warnings and then coachings for this store policy. Catherine mentioned that her and Priscilla put two more transfers in for me without my acknowledgement and they were both denied. Suspiciously, she asked if I wanted to request more transfers. I felt confused. I wondered if they understood the dilemma I was in when I moved to Aurora with my brother. The commute was 4 hours riding Pace and the Chicago Transit Authority traveling system, it shortened to 2 hours and 20 minutes using the Metra transportation.

Later on that day Priscilla asked to meet with me. I believe she tried to trick me out of a job. She explained to me that she would consider our meeting a conversation. A number of conversations can lead to a coaching. This is a workplace policy that can be printed and brought to court by Brian Cornell. Priscilla expressed her sympathy regarding the denial of my transfer. She pleaded she had nothing to do with it being denied. She also agreed it looked unreliable. She then asked how she could help me. I felt

manipulated. She offered a schedule. I told her that a transfer would have been a better solution. I explained to her that if she offered an earlier shift to prevent me from traveling so late and more hours to afford an Uber ride to closer locations. That would help a lot. The Metra trains operate every hour and it takes an hour from Bucktown to travel to Union Station, that is where I board the Metra rail to Aurora. Priscilla said that she could not guarantee an earlier work schedule for me, she would only give it to team leads and executives. She also said she would only honor early shifts between the hours of 7-6pm for a couple weeks. Priscilla reiterated that she has nothing to do with the decision of transfer request. She advised me to apply for a seasonal role if I really wanted to be transferred over. I declined it because I was a part time employee for three years and I didn't understand why that would be an option for me. She suggested shortening my work days and hours because I mentioned how expensive it was traveling from Aurora to Chicago. I declined it as well because I'm without lots of support. I need all of the hours I can receive to support myself. Target has a nice wage. Towards the end of our conversation she told me to promise her I would "*get better with time*" and I snapped back. I asked her how long it takes her to get to work and she said 15 minutes. I said I am not promising anybody anything because I am the only one with a far commute. I told her that I might as well deal with it. I grew aggravated trying to explain to the team members that disciplining me for being sick and late is harsh and confusing. I am human and Target has a call off policy. I warned her that I will be looking for someone else to speak with to resolve this issue.

Early October I realized Lauren was very mean to me, not only did she deny me a pair of pants, she lied on me in front of the guest. I Instructed a guest on how to complete an online purchase to retrieve the 30% discount. The guest bought it online with no problem. The chair was in her cart, she asked what to do with it? I called Lauren over and she wagged her fingers at me and questioned why I didn't honor it at the registers. It caught me by surprise when Lauren snapped at me and canceled the guest payment and adjusted the price for the Guest. Normally, she would have told me not to honor it because it was only online promotion. This could have led to a poor survey.

The two weeks I lived with my brother in Aurora caused me a lot of stress. He showed me he wasn't trying to support me. The car ride to Aurora metra station did not help at all. Whenever he didn't give me a ride I had to purchase a Uber gift card for the value between $25-50.00. I couldn't make him do more. Obviously, he didn't want to offer me a ride to the Union Station which was a better option. I took the weekend of september 22nd to decide my next move. I decided to utilize the Airbnb travel app to book a room near Bucktown, Chicago from September 23th to October 18th. I planned to do a monthly rental but the owner had other bookings. I walked to work for 30 minutes until my next payday. It was embarrassing and hurtful. I have my receipt and I paid an additional two weeks in cash.

During my stay I wanted to apply for an optical position and the manager warned me to talk to the store Director before applying because she didn't want to "step over anyone's toes". I feel this should be considered as a form of harassment because I've witnessed other employees apply for other roles and they were approved. Target requires an employee to complete an application to be considered for a new role.

On October 18th Lucy waited a week to tell me my brother called. I can reveal that I didnt turn on my cellar service because I didn't want to speak to them and I didn't have too much money. Regardless, they have always denied my phone calls.

I request to be Exempt from taxes the month of October. I completed the application a number of times and Katherine denied it with no explanation. Once the application is complete it alerts the supervisor and she did not inform me of her decision and the Human Resources Center could not give me a reason why exempt requests could be denied or approved.

I requested to use vacation time for my birthday on November 17th and it was denied. I requested before the deadline of that week November 4th. Priscilla left it pending passed the 17th and then updated to denied.

On October 23rd I contacted the supervisor located in Homewood IL. I moved in with my third sister in Hazel Crest, IL October 18th. During our phone conversation she exposed the truth about the decision of transfers. She said if an employee has a coaching they do not have thoughtful discussion they

immediately deny it. She offered me to resign and reapply. She told me I needed to start afresh. She would not approve a transfer for me with any coachings whether I deserved it or not. I applied for a new role and it was ignored.

The Executives did not schedule me on the holidays where I could have received "paid time in half" in the year of 2019. I have an open available schedule. I should have access to more hours.

During the Christmas season the staff was very mean, intense, and tricky towards me. They eliminated gift cards and they wouldn't even count my redcard sign ups. They had a ridiculous sign that stated we couldn't buy coffee from starbucks until we clocked out from work. it also stated that price matches had to be approved by a supervisor. All of these rules were aimed at me. Confusingly none of them were obeyed. Also Lee manipulated Target guests from gift cards. One shift, there was a promotion on video games. When the guests brought 3 video games the computers automatically generated a $100 gift card. The guests had to choose between a price match or giftcard. I asked supervisor Dan, what to do with the gift cards? He said Lee takes them. I would like the courts to review cameras on blackfriday until I resign. December I had a sinus infection. I called off for a week. I knew I had to fly to headquarters because they were going to coach me for it and needed a transfer. Most importantly I needed to confide in leadership about my horrible experience working at Target Near North.

Can the court request for Brian Cornell to bring the The Free Harassment and Workplace Bullying training course including the exam and policy? The exam confirms my suspicion that an unfair commute and unfair coaching is considered bullying along with being sick at work.

Jan. 6 I flew to headquarters. I have my trip itinerary attached and a copy of my train ticket. A representative came down the stairs to talk to me. His demeanor was extremely rude and I believe he made fun of me. I simply asked if he could contact Melissa Kremer, Chief Officer of Human Resources at Target. He asked if I had a meeting and I questioned, how could an employee of my status requested to meet a high level Executive? I told him I felt my team members including my Store Director were trying to fire me and he asked why I felt this way. I explained to him that the exam Free harassment and workplace discrimination informed me that my commute is form a bullying, my coachings are example of harassment, and working in an area without little to no support is symbolizes work place bullying. He failed to do something so simple as to go up the stairs and pass along my name and team member credentials to someone of leadership. He told me to write a complaint using the Integrity hotline. I expressed to him that my purpose for flying to Minnesota was to report my team member's suspicious behavior. The integrity hotline doesn't specify the investigator. Everything is secretive and confidential. I feared that report would be sent to Lee and that he was an investigator, I would be "screwed" meaning none of my issues would be handled. This is a conversation I would like for the courts to review on camera.

January 13th I contacted Bill store located on Belmont and Ashland. Bill number is 847-845-1407. I informed Bill that I needed him to talk to Lee. I told him that my transfer being denied was set up by Lee and his Team Leads. I expressed my confusion about self checkout, I told him I flew headquarters, and he did not respond to anything. I asked who investigates the complaints from the integrity hotline. He said he didn't know. He also said Lee only receives guest surveys. Bill said he would be on the "lookout" for my investigation report. Can the courts investigate the truth behind the integrity hotline. Bill said he can't approve transfers, he confirmed Lee could approve it. I told him I'm not sure if he will approve a transfer for me. I expressed to him that I was tired of traveling very long and far. Bill said he would lend over my contact information to Ingrid. He said she would contact me in a couple of days.

Two weeks before I resigned in January. I clocked for my 11am to 5pm shift. Catherine asked to speak to me in her office. Our conversation got intense. Ingrid and Catherine were acting very childish and immature. Catherine wanted to know why I contacted Bill. I told her I needed to talk to someone above the store leadership and I figured he would have a contact to headquarters. She mentioned that she had not heard from me since the month of September, meaning I told her that I would approach them with a new transfer request when I am ready and figured out my home situation because all of the transfers were denied and my team members claimed to have nothing to do with it. yet they constantly asked me if I

wanted to request a new one. I told her I mistrusted their input and why it made no sense to ask me another transfer request. I questioned whether my commute made ethical sense and Catherine fired back stating that I shouldn't have applied to the store. Once I mentioned that the exam clarified that a far commute is unfair and the company wants to invest in their employees physical well being her demeanor changed from being tough to asking if I could have a meeting with Priscillia and her. I declined it and told her that priscilia is mean and she also lied to me. When she offered me to apply for a seasonal role Catherine pretended to be confused and questioned Priscilla's motive. I told Catherine I wanted to speak to someone in a high level position and she mentioned Igrid. I told her I'd been waiting on that phone call. Catherine suggested that I wait 90 days to request a new transfer, if my transfer to Homewood didn't get approved. I was so confused. I couldn't understand her intentions. After our conversation I covered Rachelle's 15 minute break in self checkout. Lee came to self checkout acting strange. I would like for the court to review the cameras to see what he whispered to Alvarado, another team member working in self checkout. Alvarado walked up to me and said " When Rochelle returns to self checkout, go by Iene because Catherine wants to speak to you", I said okay and rolled my eyes. I was completely overwhelmed from talking to them. I blurted out, " What else is there to say?. I walked over to ILene and she radioed Catherine, " Ashley is here, do you want to speak with her? She responded, " Just tell her I talk to her later". When I clocked out for my lunch break Katherine looked prepared to leave. She was talking to Tracey, another desk member. Myra handed me a note. I threw it in my bag. When I got home it read and it said to call Igrid Monday at 9am with her cell number. This was strange behavior.

Jan 20th I talked to Ingrid. Her cell number is 708-269-5102. I confirmed her cell number with Bill and at 9:30am Ingrid called me. Ingrid confirmed she had nothing to do with the approval for a transfer. She said she didn't have a contact number for headquarters. Katherine shared my attendance with her and stated that it looked really bad to call off that week in December. I questioned what an employee is supposed to do when they are sick. I offered to show my emergency room discharge papers. She denied needing to see it because she couldn't approve transfers. She asked if I had any Correct of Actions on my record. I told her I don't know. I have only been coached for attendance which I found strange. I told her I think a supervisor is supposed to bring that to my attention. I also told her that I needed to work on my health, my teeth to be exact and she said I could go on a leave of absence. I expressed to her I can't afford it and the pain is severe which is why I called off. She said call Hewitt and they will get an estimate. Ingrid said if my transfer is not approved the only option was to resign and reapply. I said , "what"? She snobblishy said " you can quit your job and reapply again". I had to force Ingrid to request a transfer because she was sure it wasn't going to be approved. After our conversation she texted me Hewitt information and I asked her why didn't my request to be exempt from taxes get approved. She carelessly stated she couldn't help me with that and I would need to fill out the form. I have the text messages to prove her response. I felt hopeless and helpless.

On January 29th I left two copies of my resignation letter with Marisol. I told her to give one to Lee and Katherine and I walked right that door. I was supposed to work but instead, I left an angry resignation letter. The resignation letter will be attached.

## Failed to stop harassment and bullying

Over the last 3 years working at Target Corporation. I have experienced a number of work harassment from each of these powerful supervisors at Target Near North. I want the courts and the Brain Cornell to investigate why they treated me so terribly.

1. Did Lee deny my wage and garnishments? I applied for two payday loans in 2017. Target sent to letters stating the company participates in Wage and garnishments. I expected for the deduction to take place and it never happened. The two loans have harassed me and threatened to take me to court and invade my

personal accounts.

2. Why can't I keep my overtime? As a part time team member the company supports us with an availability form and on the website it states we can receive more than 60 hours. Lauren and Amy have sent me home early insinuating that I reached 40 hours in one week and I couldn't keep it because I'm part time. They have told Supervisor Dan to send me home early, take a long lunch break or remove a shift. I believe that it was a punishment and I would like the truth to be revealed. They even claimed that the store is reached overtime and they have to cut back on hours. Part time employees such as myself had to go home early or they cut a few shifts. I continuously had to sign the binder for inaccurate punches. I don't believe these were all true. I believe the Administrative support team members were framing me for fire or stealing hours giving it to someone else. I have attached two articles indicating that these actions are considered time theft.

3.Both Yemese and Lauren lied about correcting the date of my birth date for a number of months in the year of 2016 going to the 2017 tax season.

4.Amy created a 30 day probation for me. I suffered from severe toothaches, severe sinus infections, and upset stomachs. The only option is to call off. They combined both late ins and call offs, therefore Amy gave me 30 days to not call off or be late before documenting me. Does this sound helpful or a form of punishment? This only forced me to be sick with extreme pain and severe colds at work.

5. I am poorly reviewed each year, team leaders Ilene and Yemese assess my work performance. Suspiciously they have been removed. They all rated me an average Cashier and stated my attendance was a problem for them. They gave .30 raises to everybody for a couple of weeks. However, all the supervisors depend on me to sign guests up for Target Redcards. Amy said that the store receives a raise for a certain amount of Red Cards and that bonus goes to the store executives and not the cashiers who are forced and bribed to ask. We may get a giftcard or free drink from starbucks. Can the courts investigate this matter? I've seen Kasey ,former Assets and Protection managers at Near North pass around white envelopes ``certain cashiers'' and all Team leaders. Kasey tried to intimidate me as well. He now works between two stores, State street and Benson. I believe he wanted me fired as well. Before he got promoted and transferred over, he would huddle with all other employees working in self checkout informing them about workplace issues but he would wait until I left.

6. Ilene and Yemese accused me of accepting a fake check. They tried to convince me that a starters check is fake because it only takes $25.00 to open an account. Ilene said the check bounced. That year Lauren accused the cashier of accepting thousands of dollars of fake checks. I believe they wanted to terminate me, but when I questioned why the computer approved the check, yemese said it was still fake and this was a soft warning. They also have singled me for accepting fake coupons and selecting the "no barcode" button for items that didn't have a DPCI. Yemese printed a paper to show my name ranked the highest and to be careful and to ask a supervisor. I told her the supervisor told us to use the no barcode button and she said that's fine but do not use it too much. I was still confused.

7. The spring of 2017. I had a conversation with Lauren. I told her I needed a transfer because the staff members are making me feel uncomfortable. Whenever I was late shift manager Felita would wait to give the next employee a break until I came. To me this is insane. There are so many employees that waiting for me to clock in is absurd. I felt watched and monitored. Lauren said there were a few team members who traveled from the southside of Chicago and we only gave them bus schedules for a far commute. I noted that I have to take two trains and two buses. She still only offered me a bus schedule. During the summer of 2017 Amy started combining my calls off and late ins that led to 30 day probations and then coachings.

8. The closing shift policy at Target Near North is for team members scheduled to 12am. Everyone has to stay until the team leader dismisses us. I was against it because I will be traveling in the early morning hours. This is dangerous for a female to travel that far during those time frames. Amy didn't care and stopped Dan from allowing me to leave at 11:30pm. Other employees had cars and family members waiting for them. I ride the Redline. This is the most dangerous train line in Chicago.

9.Amy didn't want me to be trained in Guest Service or anywhere to be honest. All the Team leaders promised to train me, but claimed to be too busy. Amy finally told me that she liked me better as a cashier. I wanted to be cross trained and the team leaders told me they only offer 40 hours to certain departments such as Guest Service. They took me away for Order Pick Up because I complained about a wrong label for an item. Target Changed the cashier titles and demanded us to be trained in each department , but Lee has a tight grip on his staff members.

10.Lucy denied phone calls for me as a part time team member. My brother called me in October while I stayed in a rental on the northside of Chicago. She waited a week to tell me he called. I don't trust my brother's conversation with Lucy. She claimed he just wanted to know if I made it work. I didn't believe it. I didnt turn on my cellular to speak with them and they called my job. My siblings are not the best, especially my brother he rarely calls me. When I talked to him on the phone October 18th he kept saying find a new job. I grew scared and wanted to know if there was more to the conversation between Lucy and my brother. My brother reiterating that I needed to find a new job was suspicious. He didn't want to help me so for him to persuade me to leave was strange. I had no means to move on. My siblings aren't stable financially.

11. Lucy did not inform me on how to request to use my sick and personal time. If the courts can investigate whether my personal, sick, and vacation was accurately accumulated and If it was given to me on my final pay in February of 2020.

12. I felt like the former Assets and Protection manager, Kasey wanted to fire me as well. He would huddle up with all of the workers in self checkout instead of me. I grew concerned because Yemese had almost fired me for my attendance, she said if I got another coaching I would be finalized. Kasey had implemented some rules for workers to not leave the device down or that would be a final call for us. It was mandatory for us to help the guests who had large and huge items at the bottom of their cart. I had to overhear those rules from my co-workers because he didn't bring them to my attention. I caught a number of guests from leaving the register with unpaid bills. No reward or appraisal from Kasey. Portia and Rochelle told me he rewarded them with gift cards for helping him catch guests that were stealing. He also accused me of not scanning a refrigerator and tried to intimidate me. Felita warned me that I would be placed on a final for leaving the device unattended in front of the guests. Strangely, when Kasey left none of those rules mattered. The very few African American leads seemed to be annoyed with me. I couldn't confide in them.

13. I would like for the courts to investigate whether I have been watched inappropriately. I mention in my resignation letter that I felt overly monitored.and watched. I know that sexual harassment is a harsh accusation, but its worthy enough to investigation. I have changed my clothes in the fitting room before and after my shift.

### Failure to promote

At Target Near North I've trained seasonals and watch them surpass me into leadership roles or obtain full time positions. It's embarrassing. Target Near North doesnt interview anybody, the Executives personal pick employees and I should have been offered a full time or Team Leader shift. I believe a

higher paid position was taken away from me. I logged into my employee portal and noticed it said, " Sale Floor Team Member". I was paid and worked as a part time Guest Advocate. No one fills out an application for a new role especially a shift manager or Team leader. They are chosen. My team refused to consider all the redcards, all of the compliments I received in the surveys from guests. Amy on a number of occasions, rewarded me with coffee mugs, gift cards, and coffee drinks for handling a rude guest appropriately. Amy has claimed that she posted my surveys in her office.

## Relief/closing

I will be a High School English Teacher in Africa. My projected departure date is August of 2021. Before I embark on this new journey with the PeaceCorp, it's important that I heal emotionally from all the betrayal I have experienced. I'm striving to be the highest version of myself and therapy is a must for me. I feel my reward should exceed over $75,000 because working at Target Near North was emotionally abusive and it caused me to feel severe sadness. Attending therapy will help me invest in long lasting relationships. My surroundings and past friendships are dysfunctional and they serve me no purpose. Investing in a mentor could help me create a new path for success and happiness. I detached myself from friends and family member's because I am a victim of social pressure. At 27 years old it's difficult to not have a driving license. It's embarrassing and socially unacceptable. Soon after I left Target, I experienced more mistreatment at 3 other major companies and will be pursuing lawsuits against as well. I got hired as a Customer Service Representative at Family Dollar and the store manager fabricated a budget cut and It left me nearly homeless. I couldn't afford my Airbnb rental. The hosts I lived with were unfair and did not honor their cancellation policies. Soon after I landed in a motel. The Motel chain under Wyndham hotel and resorts. The manager ripped me off and then kicked me out. I had to beg to come home. I had to suck up my siblings and forget all the hurt they placed upon me because I needed a place to stay. I currently work at Walmart and I have already received a few verbal warnings. The management team needs some work ordinance. I'm hired as a temporary Sales Associate and I am afraid to look for an apartment because I am not sure if I will be there for long. I can't figure out why i'm being treated this way. These hurtful situations have consumed most of my thoughts and my day. This has been an emotional rollercoaster and I need to start the process of counseling.

Target Near North took away the purpose of employment. How do I become a responsible adult, if the team members constantly take away my hours? I've worked for a great company for three long and hard years and I have nothing to show for it. Instead I walked away because it became clear to me that I was being framed for fire.

Each year I am unable to benefit from Target pay increases, therefore I can't afford my own independence. I have to live with my siblings who live ruthless lives. My team members have a vendetta against me. Without fair hours I can't afford to make reasonable payments on my student loans to boost my credit score. Target offers health insurance and I can't enroll in it. I can't afford the medications, doctor visits, possible surgeries, and the fees. My teeth are a prime example. I lack the funds to stop the spread of cavities and they grew into painful root canals. I need to invest in a diet, but low income American can't afford a healthy diet plan. I've cancelled a few gym memberships for $20 because I couldn't make monthly payments. I needed every dollar.

Moving on from Target wasn't easy because I couldn't afford anything such as schooling or additional classes. I had no help from my surroundings. Target Near North got in the way of my progression. During my performance review I asked how can I be promoted? Yemese said I had to work on my confidence and I hadn't been there too long to be considered for a promotion. I can't escape the depths of poverty if my pay stubs aren't two times the rent of a potential apartment or studio. I had dreams of owning a brand and business empowering women to invest in their own success and an internship for creative women. Sadly, they walked out because I couldn't accommodate a cohesive schedule and I couldn't afford to give them a small stipend. All of my supervisors were aware of my goals and deprived me of a schedule to learn and hours to afford my travel, driving lessons, and business expenses.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br><br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br><br>☐ FEPA<br><br>☒ EEOC | Agency(ies) Charge No(s):<br><br>**444-2020-01648** |
|---|---|---|

| **ILLINOIS DEPARTMENT OF HUMAN RIGHTS** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br><br>**ASHLEY D HICKMAN** | Home Phone<br><br>**(773) 403-7345** | Year of Birth |
|---|---|---|
| Street Address<br><br>**616 EAST 90TH PLACE, CHICAGO, IL 60619** | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name<br><br>**TARGET CORPORATION** | No. Employees, Members<br><br>**501+** | Phone No.<br><br>**(773) 252-1994** |
|---|---|---|
| Street Address<br><br>**2656 NORTH ELSTON AVENUE, CHICAGO, IL 60647** | City, State and ZIP Code | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | Earliest: **11-11-2016**    Latest: **01-29-2020**<br><br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

**I began my employment with Respondent on or about November 11, 2016. My most recent position was Guest Advocate. During my employment, I was subjected to harassment and discipline. I was also subjected to different terms and conditions of employment, including, but not limited to, being denied transfers and my preferred schedule, and having my hours reduced. I complained to Respondent. Subsequently, on or about January 29, 2020, I was constructively discharged.**

**I believe I have been discriminated against because of my race, Black, and in retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally signed by Ashley Hickman on 08-27-2020 12:33 PM EDT** | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.   **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 19 of 55 PageID #:19



**balancepoint**

- Home
- Challenges
- Solutions

Careers
Client Login
Help Center
Schedule a Meeting

- About Us
- Resources
- Partner with BP

# 5 Ways Employees Steal Time At Work

Balance Point TeamJuly 17, 2018

Are you aware of how productive your employees are?

A quick glance at their phone might seem harmless but every time that employees checks Facebook, they're actually stealing from you.

They're stealing time.



Time theft is when an employee accepts pay from their employer for work that they have not actually done, or for time they have not actually put into their work.

Employee time theft can certainly hurt your business by decreasing employee productivity and costing you money.

It's important to address situations when employees are habitually late to work, not clocking in properly, and/or participating in time-wasting activities.

Check out these top 5 ways employees steal time and work and ways you can prevent it.

# Abusing Flexible Schedules

Remote teams and mobile workers are becoming more and more popular among businesses. This makes tracking an employee's efficiency and productivity very difficult. You might not notice at first, but employees have gotten more creative in knowing how to get paid for work they didn't actually do.

Remote workers have more of a flexible schedule. Typically they don't need to drive anywhere and can easily roll out of bed and jump onto their computers to start working. Using the whole "I got

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 20 of 55 PageID #:20

caught in traffic" when being late for work, a conference call, or an important meeting is no excuse.

Careers
Client Login
Help Center
Schedule a Meeting

Time theft can easily occur when dealing with remote workers. There's no one there to break up a water cooler break, a trip to the kitchen, or to monitor a lunch hour. It's important to keep track of the hours logged by your remote employers. If the employee forgets to log hours or if your company doesn't have it's own time tracking system, it's easy for time to added to the amount of hours you're being billed for.

Even if your remote employee is on salary and that person is logging 40 hours of work per week, is the work reflecting the time put in? It's important to have sufficient time tracking systems in place along with proper communication to make sure you're on top of the amount of hours your remote employee is working.

# Buddy Punching

Companies who use traditional time clocks can easily have a situation where one employee clocks in for another employee, even though they aren't at work yet. Usually this situation arises for hourly paid workers who are running late to work. Nobody wants to jeopardize a part of their paycheck if they are running late, but should companies keep forking out the cash if employees aren't acting responsibly?

With all the technology available, it's a good idea to make the upgrade. Biometric time clocks allow employees to have their finger scanned to verify attendance. This solution can eliminate "buddy punching" entirely.

# Using Technology For Personal Use

Technology is everywhere and it's hard to escape it even if we want to. It's not uncommon for employees to check Facebook or their email, maybe make a quick phone call if they are on break, but how much of that is spilled over into their work time?



It may even stem from having slow systems or processes in place that very small windows of downtime. They click over to log into the system, the loading screen pops up, so they open their phone "real quick" to kill the 50 seconds the computer is taking, which turns into a 10 minute long Instagram scroll.

We consume so much technology throughout the day that it's natural for us react without thinking

to a simple text, email, or news update on our phone. However, employees can often turn to their phone on days they are feeling lazy, tired, and trying to avoid work.

Careers
Client Login
Help Center
Schedule a Meeting

# Extended Break Times

It's important that employees get a mental break at some point during the day, but it's not ok for employees to take advantage of that time. If your business doesn't require employees to clock out before breaks, a simple 30 minute lunch break can quickly extend.

Managers can use some of these tips to help assess the situation.

If employees aren't required to punch in and out for break times, it's ideal to have a window of time employees can take lunch. This way you can see which employees leave during the designated time and how long they're gone for.

If an employee seems to be taking advantage of the time given for breaks, try addressing the situation before it escalates. Outline the expectations your business has for employee attendance. Managers can even review the employee handbook to cover those topics.

However, it is important that your employees know that you do care about their health. Encouraging your employees to take a break to recharge can actually help productivity and decrease the amount of work distractions that pop up during the day.

Smokers also cost employers large amounts of money. The number is more impressive too:

Per an Ohio State University study, workers who smoke each cost their employers $5,800 a year.

This amount is due primarily to lost productivity and more breaks.

Employers aren't legally obligated to allow employees to take smoke breaks. However, if your company does allow employees to step out for a smoke, you might want to ask them to make up the hours at the end of the day to make up for lost time. This could be a way to keep both parties happy.

# Socializing

A friendly work environment is certainly healthy for employees. It's a great thing when co-workers can form friendships and feel comfortable in the workplace.



Careers
Client Login
Help Center
Schedule a Meeting

Improving Performance Reviews in Today's New Workplace

November 3, 2020

The First Step in Evaluating HCM Solutions

October 27, 2020

5 Biggest Challenges Managing Remote Employees

October 13, 2020

Why NOW is the Perfect Time to Invest in Learning Management

October 6, 2020

Careers
Client Login
Help Center
Schedule a Meeting

## Categories

Brokers

CFO

COVID-19 Resources

CPA

HCM

HR

Management

News

Payroll

Q&A

Timeline Event

Uncategorized

point About Us

Contact

Balance Point combines innovative technology and first-class support to create a single solution that addresses every facet of the employee life cycle.

From talent acquisition, payroll, and time & labor management—to HR support, culture, and engagement, Balance Point is the one-stop shop for all your human capital management needs.

Balance Point

65 Harristown Road

Heritage Plaza II

Suite 208

Glen Rock, NJ 07452

**Phone**

(201) 712-1157

Careers

Client Login

Help Center

Schedule a Meeting

- Home
- Challenges
  - People
  - Compliance
  - Technology
- Solutions
  - Human Capital Management
    - Talent Acquisition
    - HRIS
    - Culture & Engagement
    - Learning Management
    - Time & Labor Management
    - Benefits Administration

Join Thousands of Subscribers!

Subscribe Free

**Fax**

(201) 712-1167

**Email**

info@balancepointHCM.com

©2020 X-Pay, LLC. All rights reserved. | Privacy Policy

# Your receipt from Airbnb



Receipt ID: RCQ5FNETKE · Sep 20, 2019

## Chicago

**11 nights in Chicago**

Mon, Sep 23, 2019 → Fri, Oct 04, 2019
Shared room · 1 bed · 1 guest

3464 W Diversey Ave
Chicago, IL 60647
United States

Hosted by Earphoria Jules Esh

Confirmation code: HMAANF3TEP
Go to itinerary · Go to listing

Traveler: Ashley Hickman

Cancellation policy

**Have a question?**

Visit the Help Center

## Price breakdown

| | |
|---|---|
| $20.09 x 11 nights | $221.00 |
| 6% weekly price discount | -$13.26 |
| Cleaning fee | $5.00 |
| Service fee | $27.44 |
| Occupancy taxes and fees | $49.71 |
| **Total (USD)** | **$289.89** |

## Payment

| | |
|---|---|
| VISA ···· 2134 | $289.89 |
| Sep 20, 2019 · 05:04PM CDT | |
| **Amount paid (USD)** | **$289.89** |

**Occupancy taxes**

Occupancy Taxes include General Sales and Use Tax (Chicago), General Sales and Use Tax (Illinois), Lodging Tax (Chicago), Occupancy Tax (Chicago), Hotel Tax (Chicago), Accommodations Tax (Chicago), Lodging Surcharge (Chicago), Accommodations Tax (Illinois), Accommodations Tax (Cook), General Sales and Use Tax (Chicago), General Sales and Use Tax (Illinois), Lodging Tax (Chicago), Occupancy Tax (Chicago), Hotel Tax (Chicago), Accommodations Tax (Chicago), Lodging Surcharge (Chicago), Accommodations Tax (Illinois), Accommodations Tax (Cook), General Sales and Use Tax (Chicago), General Sales and Use Tax (Illinois), General Sales and Use Tax (Cook).

**Airbnb Payments, Inc.**

Airbnb Payments is a limited payment collection agent of your Host. It means that upon your payment of the Total Fees to Airbnb Payments, your payment obligation to your Host is satisfied. (i) the Host's cancellation policy (available on the Listing); or (ii) Airbnb's Guest Refund Policy Terms, available at www.airbnb.com/terms. Questions or complaints: contact Airbnb Payments, Inc. at 855-4-AIRBNB (855-424-7262).

Payment processed by:
Airbnb Payments, Inc.
888 Brannan St, San Francisco, CA 94103

Airbnb, Inc.
888 Brannan St, San Francisco, CA 94103
www.airbnb.com





**+1 708-269-5102**

JANUARY 20, 2020

**Hewitt**
1 800 8285850

9:20 AM                                    Size: 1KB

Thanks

9:27 AM

Hi,

I meant to ask you over the phone, but I didn't get a chance to. I request to go non exempt which is to keep all of your taxes in October and it has not been approved or looked at. I asked a few TCF members

Type message

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 27 of 55 PageID #:27



←     +1 708-269-5102    📞   👤   ⋮

I also requested to utilize my vacation time for my birthday (11/17) I requested it 11/02 and the deadline for the time request (11/17-11/24) was due 11/04 and I entered it in 11/02 and It was left pending until 11/22 and then updated to denied. I have been afraid to requested a day off for a while because I am uncertain of what's going on or what happen.

Can you please help me with my request to become non exempt? Non exempt is to not have taxes

📎    Type message

       



+1 708-269-5102

Can you please help me with my request to become non exempt? Non exempt is to not have taxes deducted from your check, am I right?

Thank you again and have a good day.

11:43 AM



Hello. You need to fill out new tax forms in Workday to change your deduc-tions. I cannot do that for you. As far as vacation time submitted, that should just automatically go through. If you're talk-ing about request offs,

Type message

  

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 29 of 55 PageID #:29



+1 708-269-5102

good day.

11:43 AM



Hello. You need to fill out new tax forms in Workday to change your deductions. I cannot do that for you. As far as vacation time submitted, that should just automatically go through. If you're talking about request offs, those would need to be approved by your leader.

12:17 PM

Ok

12:27 PM

 Type message



 Gmail

Ashley Hickman <ashley.d.hickman@gmail.com>

## eTicket Itinerary and Receipt for Confirmation O7QY11

**United Airlines, Inc.** <Receipts@united.com>
To: ASHLEY.D.HICKMAN@gmail.com

Thu, Jan 2, 2020 at 8:51 AM



Thu, Jan 02, 2020

# Thank you for choosing United.

A receipt of your purchase is shown below. Please retain this email receipt for your records.

Confirmation Number:

# O7QY11

Flight 1 of 1 UA1708

Class: Economy (N)

Mon, Jan 06, 2020

# 06:00 AM

Chicago, IL, US (ORD)

Mon, Jan 06, 2020

# 07:33 AM

Minneapolis/St. Paul, MN, US (MSP)

Traveler Details

HICKMAN/ASHLEYD
eTicket number: **0162488367201**

Seats: **ORD-MSP -----**

Purchase Summary

| | |
|---|---|
| Method of payment: | Visa ending in 3560 |
| Date of purchase: | Thu, Jan 02, 2020 |
| Airfare: | 124.65 USD |
| U.S. Transportation Tax: | 9.35 USD |
| September 11th Security Fee: | 5.60 USD |
| U.S. Flight Segment Tax: | 4.30 USD |
| U.S. Passenger Facility Charge: | 4.50 USD |
| Total Per Passenger: | 148.40 USD |

## Total:     148.40 USD

**Fare Rules**

Additional charges may apply for changes in addition to any fare rules listed.
NONREF/NOCHGS/NOCBBG/NOASR

## Baggage allowance and charges for this itinerary

| Origin and destination for checked baggage | 1st bag charge | 2nd bag charge | 1st bag weight and dimensions | 2nd bag weight and dimensions |
|---|---|---|---|---|
| Mon, Jan 06, 2020<br>Chicago, IL, US (ORD - O'Hare) to Minneapolis/St. Paul, MN, US (MSP) | 30 USD | 40 USD | 50lbs(23kg) - 62in(157cm) | 50lbs(23kg) - 62in(157cm) |

## Disinsection Notice

Certain countries require that the passenger cabins of aircraft be treated with insecticides. For additional information and a list of those countries, please visit the U.S. Department of Transportation's disinsection website.

## IMPORTANT CONSUMER NOTICES

**Notice of Baggage Liability Limitations** - For domestic travel between points within the United States (except for domestic portions of international journeys), United's liability for loss of, damage to, or delay in delivery of a customer's checked baggage is limited to $3,500 per ticketed customer unless a higher value is declared in advance and additional charges are paid (not applicable to wheelchairs or other assistive devices). For such travel, United assumes no liability for high value, fragile, perishable, or otherwise excluded items; excess valuation may not be declared on certain types of valuable articles. Further information may be obtained from the carrier. For international travel governed by the Warsaw Convention (including the domestic portions of the trip), maximum liability is approximately 640 USD per bag for checked baggage, and 400 USD per passenger for unchecked baggage. For international travel governed by the Montreal Convention (including the domestic portions of the trip), maximum liability is 1,131 SDRs per passenger for baggage, whether checked or unchecked. For baggage lost, delayed, or damaged in connection with domestic travel, United requires that customers provide preliminary notice within 24 hours after arrival of the flight on which the baggage was or was to be transported and submit a written claim within 45 days of the flight. For baggage damaged or delayed in connection with most international travel (including domestic portions of international journeys), the Montreal Convention and United require customers to provide carriers written notice as follows: (a) for damaged baggage, within seven days from the date of receipt of the damaged baggage; (b) for delayed baggage, within 21 days from the date the baggage should have been returned to the customer. Please refer to Rule 28 of United's Contract of Carriage for important information relating to baggage and other limitations of liability.

**Notice of Incorporated Terms** - Transportation is subject to the terms and conditions of United's Contract of Carriage, which are incorporated herein by reference. Incorporated terms may include, but are not limited to: 1. Limits on liability for personal injury or death of the customer, and for loss, damage, or delay of goods and baggage, including high value, fragile, perishable, or otherwise excluded items. 2. Claims restrictions, including time periods within which customers must file a claim or bring an action against the carrier. 3. Rights of the carrier to change terms of the contract. 4. Rules about reconfirmation of reservations, check-in times, and refusal to carry. 5. Rights of the carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of an alternate air carrier or aircraft, and rerouting. The full text of United's Contract of Carriage is available at united.com or you may request a copy at any United ticket counter. Passengers have the right, upon request at any location where United's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of United's Contract of Carriage.

**Notice of Certain Terms** - If you have purchased a restricted ticket, depending on the rules applicable to the fare paid, one or more restrictions including, but not limited to, the following may apply to your travel: (1) the ticket may not be refundable but can be exchanged for a fee for another restricted fare ticket meeting all the rules/restrictions of the original ticket (including the payment of any difference in fares); (2) a fee may apply for changing/canceling reservations; or (3) select tickets may not be eligible for refunds or changes even for a fee; (4) select tickets have no residual value and cannot be applied towards the purchase of future travel; or (5) travel may be restricted to specific flights and/ or times and a minimum and/or maximum stay may be required. United reserves the right to refuse carriage to any person who has acquired a ticket in violation of any United tariffs, rules, or regulations, or in violation of

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 32 of 55 PageID #:32

any applicable national, federal, state, or local law, order, regulation, or ordinance. Notwithstanding the foregoing, you are entitled to a full refund if you cancel a ticket purchased at least a week prior to departure within 24 hours of purchase.

**Notice of Boarding Times** - For Domestic flights, customers must be at the boarding gate at least 15 minutes prior to scheduled departure. For International flights, customers must be at the boarding gate at least 30 minutes prior to scheduled departure. The time limits provided by United in this Notice are minimum time requirements. Customer and baggage processing times may differ from airport to airport. Please visit united.com for information regarding airport-specific boarding times. It is the customer's responsibility to arrive at the airport with enough time to complete check-in, baggage, and security screening processes within these minimum time limits. Please be sure to check flight information monitors for the correct boarding gate and the departure time of your flight. Failure to be at the boarding gate by the required time could result in the loss of your seat without compensation, regardless of whether you are already checked in or have a confirmed seat and boarding pass.

## ADVICE TO INTERNATIONAL PASSENGERS ON LIMITATIONS OF LIABILITY - Passengers embarking upon a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that the provisions of an international treaty (the Warsaw Convention, the 1999 Montreal Convention, or other treaty), as well as a carrier's own contract of carriage or tariff provisions, may be applicable to their entire journey, including any portion entirely within the countries of departure and destination. The applicable treaty governs and may limit the liability of carriers to passengers for death or personal injury, destruction or loss of, or damage to, baggage, and for delay of passengers and baggage

Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under an international treaty. For further information please consult your airline or insurance company representative.

## Notice - Overbooking of Flights - Airline flights may be overbooked, and there is a slight chance that a seat will not be available on a flight for which a person has a confirmed reservation. If the flight is overbooked, no one will be denied a seat until airline personnel first ask for volunteers willing to give up their reservation in exchange for compensation of the airline's choosing. If there are not enough volunteers, the airline will deny boarding to other persons in accordance with its particular boarding priority. With few exceptions, including failure to comply with the carrier's check-in deadlines, which are available upon request from the air carrier, persons, denied boarding involuntarily are entitled to compensation. The complete rules for the payment of compensation and each airline's boarding priorities are available at all airport ticket counters and boarding locations. *Some airlines do not apply these consumer protections to travel from some foreign countries, although other consumer protections may be available. Check with your airline or your travel agent.*



A STAR ALLIANCE MEMBER

Copyright © 2020 United Airlines, Inc. All Rights Reserved

**E-mail Information**
**Please do not reply to this message using the "reply" address.**
The information contained in this email is intended for the original recipient only.

View our Privacy Policy        View our Legal Notices

Case: 1:20-cv-06987 Document #: 1 Filed: 11/18/20 Page 33 of 55 PageID #:33

**"A root canal is where we clean inside your tooth"**

# REFERRAL - ROOT CANALS BY DR JET

Check Box ☐ Consultation Only $75

☐ Root Canal (1st Time) $400
WE DO NOT DO RETREATMENTS

APPOINTMENT DAY DATE AND TIME:_____

Patient's Name: Ashley Hickman    Date: 2/27/2020

Tooth # (must have to schedule) ~~WEEK~~ #19

Comments: _____

Post space: Yes/No        Crown Lengthening: Yes/No (inform patient)

Referring Dr./Office _____

Tel #: _____

## Office Policies

1) Bring referral, x-rays, and photo i.d. to appointment
2) Payment due before procedure - no checks or credit cards – cash/money order accepted
3) $50 Cancellation Fee – $50 to change appointment
4) Arrive 15 minutes early – Late patients must reschedule
5) No family/parents allowed in exam rooms – no exceptions
6) We will call to confirm twice before the appointment – please respond
7) Return to your dentist immediately for crown
8) Plan to be at our office for 2 hours

JET CHIRANAND DDS
1712 W. BELMONT AVE #1
CHICAGO, IL 60657
Phone: 773-883-1557
Office Hours: Mon-Sat 5:30am to 3:00pm

General Dentist – Root Canals Only
Microscope Trained
30,000 Root Canals Performed
Serving the community over 10 years!

WWW.DRJETDDS.COM
rootcanaldentist@yahoo.com
Fax: 773-883-4994

DIRECTIONS
I-94 or LAKESHORE EXIT BELMONT



| Treatment Plan Total | 4,055.00 |
|---|---|
| Estimated Deductible to be Applied | 0.00 |
| Estimated Insurance Payment | 0.00 |
| Estimated Patient's Portion | 4,055.00 |
| Patient Balance | 0.00 |
| Family Balance | 0.00 |

| Dental Insurance Benefits | | Patient | |
|---|---|---|---|
| | | Primary | Secondary |
| Annual Plan Benefits | | 0.00 | 0.00 |
| Paid Benefits YTD | | 0.00 | 0.00 |
| Pending Insurance Est. YTD | | 0.00 | 0.00 |
| Est. Benefits Remaining YTD | | 0.00 | 0.00 |
| Benefits Expire | | NA | NA |
| Deductible Owed YTD | Standard | 0.00 | 0.00 |
| | Preventive | 0.00 | 0.00 |
| | Other | 0.00 | 0.00 |

Primary Dental Insurance

Secondary Dental Insurance

RCT #19 / crown #19 / Core #19

total $ 1390.00

OK to split into 5 pymnts bi-weekly

of $ 278.00

ok, per Niki (OM)

Next pymnt date(s)

3/27

4/10

4/24

5/8



# PrimeCareHealth
COMMUNITY HEALTH CENTERS

# **Patient Referral Form**

Name: Ashley Hickman _____ DOB: 11/17/92 _____

Lawndale

3600 W Roosevelt RD

Chicago IL, 60624

Phone: (773)565-4042

Reason for referral: EXt #1, 16, 17, 32 _____

Relevant Medical History Considerations: _____

Dentist Name: Amanda Prentice _____ Date: 2/27/2020

PrimeCare Dental
N. Western Avenue, Suite 401
Chicago, IL 60622
Office
Fax

# John H. Stroger, Jr. Hospital of Cook County

**Cook County Bureau of Health Services**

PLEASE PAY THE AMOUNT DUE. IF UNABLE TO PAY, PLEASE CONTACT US TO MAKE ARRANGEMENTS OR APPLY FOR FINANCIAL ASSISTANCE. CALL 866-223-2817 TO REQUEST AN ITEMIZED BILL OR ACCESS WWW.COOKCOUNTYHHS.ORG FOR MORE INFORMATION. PLEASE USE THE BACK OF THE PAYMENT COUPON TO LET US KNOW OF ADDITIONAL INSURANCE COVERAGE. THANK YOU FOR ALLOWING COOK COUNTY HEALTH AND HOSPITALS SYSTEM TO SERVE YOUR HEALTHCARE NEEDS.

ASHLEY HICKMAN
16524 BRIDON LN
OAK FOREST IL 60452

## Account Summary

| | |
|---|---|
| Patient Name: | Hickman ,Ashley |
| Statement Date: | 07/08/20 |
| Service Date(s): | 05/08/20 |
| **Account Number:** | **828748517** |
| Medical Record Number: | |

## Charge Summary

| | |
|---|---|
| Total Charges: | $1,048.00 |
| Payments/Adjustments: | $.00 |
| Account Balance: | $1,048.00 |
| Please Pay This Amt: | $1,048.00 |

## Insurance Information

Ins. 1:
Ins. 2:
Ins. 3:
Ins. 4:

## Contact Us

For questions, call customer service at:
(866) 223-2817.

---

**Cook County Health & Hospitals**
15900 South Cicero Ave
Bldg B
Oak Forest IL 60452

ADDRESS SERVICE REQUESTED

☐ Check box if your address or insurance information has changed. Please make changes on back.

MDG2020 00000008 00

ASHLEY HICKMAN
16524 BRIDON LN
OAK FOREST IL 60452

| Account Number: | Please Pay This Amount: |
|---|---|
| 828748517 | $1,048.00 |
| Patient Name: | Due By: |
| Hickman ,Ashley | 08/07/20 |
| | Amount Paid: |

Make Check Payable To J H Stroger Hosp of Cook Cty

COOK COUNTY HEALTH & HOSPITALS
P.O. BOX 70121
CHICAGO, IL 606730121

100000008287485170010000001048009

Target Corporation
Ashley Hickman
Team member:70586417
Date: January 29th 2020

Monday January 28th I ordered an Uber gift card from Target. I received a notification that my gift card was ready to uploaded to my Uber account and the gift card will not add to my account. I constantly re-added the gift card code and it refused to add the amount to my uber account.I was scheduled to work 3:00 pm to 9:30 pm. I tried to update my Uber application, I was told by two teams Uber gift cards are non refundable and exchangeable. I left around 7pm to make sure I would not miss my last bus scheduled to leave at 9:50pm from the far Southside of Chicago. If I stayed I would've been stranded and because of this recent situation and lack of support I am forced to immediately resign. I will no longer afford expensive Ubers and 2-3 hour commute to work 4-5 days out of the week. My body is physically exhausted, I am suffering from minor headaches and migraines. No one at work wanted to help at all.

Target Near North isn't following Target Corporation's friendly and kind workplace environment. Instead I felt like I am being punished and penalized. Near North leadership is poor and I am tired of suffering in silence. It seems to me that Target as a corporation that wants us to use good judgement not only for the guest, but for its employees as well. My transfer being denied made no sense to me. I don't understand suffering another 90 days with a brutal commute to show other stores I am reliable. The truth is power was being abused and now I am leaving a company I've worked at for 3 years simply because two supervisor couldn't make a verbal agreement to transfer a loyal team member to a closer location and when I asked for transfer two years ago, a bus schedule was offered and still wasn't honored. This is a very mean staff. I had no idea coaching would prohibit a successful transfer. In fact, I should not been coached for being sick and late. This is a simple minded and careless staff.

I am growing tired of hiding behind my smiles. I felt confined for three years, I couldn't exercise Target's flexibility policy for employees. I am not scheduled to be economically profitable each week. I am scheduled less than 60 hours bi weekly at times. Lately I felt excessively watched and monitored. I witnessed attitudes flares and the wishy washy work environment. Resigning from Target is not what I want to do, but I have been pushed. When I talked to higher leadership such as Ingrid. As a human resources District Manager I would've livid a team member was offered a bus schedule from the time I got hired instead of a transfer. Ingrid was not helpful and it didn't seem to care about far commute. If she really had no say in approving a transfer, offering me a contact to headquarters should have been given , instead she suggested for me to resign and reapply. Wouldn't a transfer be easier? I will not rely on hope that a supervisor will give me my job back once I resign as well as returning from a leave of absence. Her response was very suspicious.

I don't understand why I have to suffer. I believe I have been intentionally overlooked for promotions. I should have been offered a full time role or given at least 35-37 hours a week to profit from Target pay increase. Target is billion dollar company located across the nation. The employee benefits and maximum hours to receive is listed on the website under labor law policy. I feel I have been cheated out of a fair hours.

I feel this was a plan to push me out of Target a long while ago. I believe such deceptive minds forgot Target can provide a decent standard of living for all of it employees. I stayed at this job because it was my only support system. It seems as if it's in the hands of very mean people who forced me to work around Near North's store policy including unfair scheduling and distribution of hours. This has been a burden on my shoulder. The fact that no one offered me a contact to headquarters left me feeling uneasy. I will not scramble around for a job if I were to go on Leave of absence or resigning than reapplying. I will resign on my own terms. Near North's leadership and behavior is offensive to Target's policy of making good and ethical decisions. I will not give Near North's two weeks simply because this team has very mean to me and it has affected me physically and financially. Near North's does not deserve a proper two weeks notification and my good work ethic and dedication to Target Corporation.

# Patient Treatment Case Report

| | | | | |
|---|---|---|---|---|
| **Patient:** | HICKMAN, ASHLEY | | **Date:** | 3/12/2020 |
| **Provider:** | Alhareth Dhari DMD, Dr | | **Chart #:** | HI0064 |
| **Phone:** | (773)565-4042 | | **SS #:** | |
| **Office:** | 3600 W Roosevelt Rd | | **Birthdate:** | 11/17/1992 |
| | Chicago, IL 60624 | | | |

| | | |
|---|---|---|
| **Case Name:** Treatment Plan | **Priority:** None | **Finance Status:** None |

**Alternate Cases:**

**Status:** Created      **Last Updated:** 3/12/2020

**Comment:** Case created as a result of newly added procedure

**Case Note:**

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 0 | 13 | | D2751 | DD28 | Crown-porc fused to base metal | 600.00 | 600.00 | 0.00 | 0.00 | 892.00 |
| 03/12/20 | 03/12/20 | 0 | 13 | | D2950 | DD28 | Core buildup, include any pins | 90.00 | 90.00 | 0.00 | 0.00 | 220.00 |
| 03/12/20 | 03/12/20 | 0 | 13 | | D3320 | DD28 | Endo therapy -premolar(ex rest) | 600.00 | 600.00 | 0.00 | 0.00 | 735.00 |
| 03/12/20 | 03/12/20 | 0 | 19 | | D2751 | DD28 | Crown-porc fused to base metal | 600.00 | 600.00 | 0.00 | 0.00 | 892.00 |
| 03/12/20 | 03/12/20 | 0 | 19 | | D2950 | DD28 | Core buildup, include any pins | 90.00 | 90.00 | 0.00 | 0.00 | 220.00 |
| 03/12/20 | 03/12/20 | 0 | 19 | | D3330 | DD28 | Endo therapy - molar (ex rest) | 700.00 | 700.00 | 0.00 | 0.00 | 945.00 |
| | | | | | | | **Visit: 0 Subtotal:** | **2,680.00** | **2,680.00** | **0.00** | **0.00** | **3,904.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 1 | 1 | | D7210 | DD28 | Extract, erupted th, rem oth | 150.00 | 150.00 | 0.00 | 0.00 | 262.00 |
| 03/12/20 | 03/12/20 | 1 | 4 | | D7210 | DD28 | Extract, erupted th, rem oth | 150.00 | 150.00 | 0.00 | 0.00 | 262.00 |
| | | | | | | | **Visit: 1 Subtotal:** | **300.00** | **300.00** | **0.00** | **0.00** | **524.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 2 | 16 | | D7210 | DD28 | Extract, erupted th, rem oth | 150.00 | 150.00 | 0.00 | 0.00 | 262.00 |
| | | | | | | | **Visit: 2 Subtotal:** | **150.00** | **150.00** | **0.00** | **0.00** | **262.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 3 | 32 | | D7210 | DD28 | Extract, erupted th, rem oth | 250.00 | 250.00 | 0.00 | 0.00 | 262.00 |
| | | | | | | | **Visit: 3 Subtotal:** | **250.00** | **250.00** | **0.00** | **0.00** | **262.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 4 | 17 | | D7220 | DD28 | Extraction-impacted/soft tis | 315.00 | 315.00 | 0.00 | 0.00 | 315.00 |
| | | | | | | | **Visit: 4 Subtotal:** | **315.00** | **315.00** | **0.00** | **0.00** | **315.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 5 | LL | | D4341 | DD28 | Perio scale/root pln-4+per quad | 90.00 | 90.00 | 0.00 | 0.00 | 210.00 |
| 03/12/20 | 03/12/20 | 5 | UL | | D4341 | DD28 | Perio scale/root pln-4+per quad | 90.00 | 90.00 | 0.00 | 0.00 | 210.00 |
| | | | | | | | **Visit: 5 Subtotal:** | **180.00** | **180.00** | **0.00** | **0.00** | **420.00** |

| Ent Date | Prc Date | Visit | Tooth | Surface | Code | Prov | Description | Fee | Pat | Prim Ins | Sec Ins | FEE 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/12/20 | 03/12/20 | 6 | LR | | D4341 | DD28 | Perio scale/root pln-4+per quad | 90.00 | 90.00 | 0.00 | 0.00 | 210.00 |
| 03/12/20 | 03/12/20 | 6 | UR | | D4341 | DD28 | Perio scale/root pln-4+per quad | 90.00 | 90.00 | 0.00 | 0.00 | 210.00 |

\* Recommended Case

PRIME CARE WEST TOWN

312-633-5841

HICKMAN, ASHLEY (10003693/Anh S. La)



#4                                                                      12/4/2018

## Advocate South Suburban Hospital
### 17800 Kedzie Ave., Hazel Crest, IL 60429
### Main Hospital: (708) 799 – 8000
### Emergency Department: (708) 213 – 4200

## Discharge Instructions

*Given the multitude of health plans and insurance coverage, we recommend that you check with your primary care physician and/or Health Plan to make sure that your referral, if necessary, will be covered by your insurance.*

**Patient Information**

**Name:** HICKMAN, ASHLEY    **Date of Birth:** 11/17/1992 12:00 AM    **Arrival Time:** 12/30/2019 7:05 PM

**Emergency Care Provider:** EMERGENCY ROOM, STAFF

## Patient Instructions

**HICKMAN, ASHLEY** has been given the following list of prescriptions, follow-up instructions, and patient education/performed procedure materials. Please read your instructions carefully:

### Prescriptions:
**Fill New Prescriptions:**

amoxicillin-clavulanate (Augmentin oral 875-125 mg tablet) 1 tab Oral Every 12 hours (explicit times) 7 days
Dosage expressed as amoxicillin
with food or milk
dextromethorphan-guaifenesin (Mucinex DM (Humibid DM) oral 30 mg-600 mg CR tablet) 1 tab Oral Every 12 hours (explicit times) 7 days

An ER Physician has reviewed the medication list given at the time of your initial ER evaluation and considered them during treatment, prescribing, and at discharge. If there are medications that you are taking, but did not inform the physician, please consult your primary care physician.

**You/Your significant other have received examination and treatment on an emergency basis. If no specific follow-up instructions have been provided, please contact your doctor or the doctor we have referred you to within 24 hours to arrange for follow-up care. Please return to this facility if you encounter any problems, or if you are unable to contact your physician.**
**Follow-up Instructions:**

**With:**                    **Address:**                    **When:**

Name: HICKMAN, ASHLEY                    Page 1                    Dec/30/2019 19:53:02
MRN: SSH-000854316

| ACCESS Family Health Society | 152 W. Lincoln Highway  Chicago Heights, IL  60411 7087549687 Business (1) | Within 1 to 2 days |
|---|---|---|

**Patient Education and Performed Procedure Materials**

HICKMAN, ASHLEY has been given the following Patient Education based on your evaluation and/or procedures performed during this visit:

Upper Respiratory Infection, Adult; Sinusitis, Adult

**IMPORTANT:** PLEASE READ YOUR INSTRUCTIONS CAREFULLY

You/Your significant other have received examination and treatment on an emergency basis. Contact your doctor or the physician we have referred you to within 24 hours to arrange for follow up care. Return to this facility if you have any problems, or are unable to contact your physician.

XRAYS

The interpretation of any x-rays you may have received at the time of your emergency visit is only a preliminary report. If there is a change that requires a different plan of action, you will be notified at the telephone number you provided during your registration.

CULTURES

The results of any cultures obtained at the time of your emergency visit will not be posted for 1 to 5 days. If your culture results are positive, and a change in your treatment is required, you will be notified at the telephone number you provided during your registration.

We are sure that a trip to the ER was not in your plans today. We sincerely hope that we were able to provide you or your family member with VERY GOOD care. Our physicians and clinical staff are committed to quality and service. As always, you are the important factor in your recovery. Please follow these instructions carefully. If you have any medical related questions regarding your treatment or discharge instructions from the Emergency Department please call (708) 213 – 4200. If you have problems that we have not discussed during this visit please CALL OR VISIT YOUR DOCTOR RIGHT AWAY. If you cannot reach your doctor, return to the emergency department.

To update your insurance information with the registration department, please call (708) 213 – 2000.
To obtain copies of your x-rays or any other radiology procedure, please call (708) 213 – 3335.
To obtain copies of your medical records, please call (708) 213 – 3335.
To schedule an outpatient test please call Central Scheduling at (708) 213 - 1000
Your suggestions and comments are valued, so please take the time to fill out a survey when you receive one by mail.
If you cannot give a "5" or "Very Good" in any area, please let a staff member know immediately so we can rectify the issue. Please feel free to call the numbers below at any time to let us know how we are doing.

Kathy Reiter
Emergency Department Manager
(708) 213 - 4608

Deshon Moore, MD
Emergency Department Associate Medical Director
(708) 213 - 4230

Name:  HICKMAN, ASHLEY          Page 2          Dec/30/2019 19:53:02
MRN:  SSH-000854316

**IF YOU NEED ASSISTANCE FINDING A PHYSICIAN IN YOUR AREA, CALL 1-800-323-8622.** If your insurance is Medicaid/Kidcare/Illinois Health Connect, please call your insurance company - Illinois Health Connect at (877) 912 - 1999 for assistance.

## Facts Everyone Should Know

### SMOKING

There is a link between cigarette smoking and heart disease and lung disease. Almost 500,000 Americans die each year of smoking related illness. Nicotine in the smoke increases blood pressure and heart rate. It also causes narrowing of the arteries in the heart, arms and legs decreasing blood supply to these areas.

The most important thing you can do for your health is to stop smoking and to avoid secondhand smoke (smoke coming from other smokers). Anyone can quit smoking. Once you or your loved ones have made the decision to quit, there is information to help you succeed. Contact the American Lung Association at 312-781-1100.

In addition, you might try on-line resources:

· www.smokefree.gov
· www.philipmorrisusa.com (Quitting smoking or Secondhand smoke)
· www.lungusa.org (Tobacco Control)
· www.nicotine-anonymous.org

### SEATBELTS

There Is no doubt that seatbelts save lives. Every day in the Emergency Department we see that people driving without seatbelts are more severely hurt. We **always** buckle up. Please do the same! Protect your child with a child safety seat.

### ALCOHOL USE

Unhealthy alcohol use is a common cause of many injuries and/or illnesses that bring people to hospitals and trauma centers. 25% of adults of adults in the United States drink too much alcohol. **If you answer yes to two or more to the following questions, it indicates that you need further counseling:**

Have you ever felt you should cut-down on your drinking?

Do you get annoyed when people talk about your drinking?

Do you feel guilty about your drinking?

Have you ever had an 'eye-opener' or a drink to get going after waking up?

OR

Healthy man up to age 65 that drinks more than 4 drinks in one day AND more than 14 drinks in a week.

Healthy women (and healthy men over age 65) that drink more than 3 drinks in a day and more than 7 drinks in a week.

**IS IT A STROKE?** Check these signs **FAST!** Hotline: (877) 335-3020

**F**ace – Does the face look uneven? Ask them to smile.

**A**rm – Is one arm drifting down? Ask them to raise both arms.

**S**peech – Is their speech sound strange? Ask them to repeat a phrase.

**T**ime – Every second, brain cells die. Call 911 at ANY sign of a stroke.

**IS IT A HEART ATTACK?** Check these signs! Call 911 if experiencing:

Chest pain

Shortness of breath

Pain between the shoulder blades

Sweating at rest

Nausea

**Domestic Violence is a CRIME... We Care**

You can speak up safely here or call South Suburban Family Shelter
Hotline: (877) 335-3020

## Patient Visit Summary

**HICKMAN, ASHLEY** has been evaluated for the following reason(s) stated during registration and/or triage:
General medical; Medical problem - minor; body aches cough sore throat

## Medication Interactions/Allergies:

HICKMAN, ASHLEY has the following Medication Interactions and/or allergies, **only if listed below**:
NKA

## Diagnostic Tests & Exams:

HICKMAN, ASHLEY had the following diagnostic tests and/or exams performed during this visit, **only if listed below**:

| Name | Date/Time | Status |
|------|-----------|--------|
| URINE MACRO-POC | 12/30/2019 19:47 | Final |

# Upper Respiratory Infection

Most upper respiratory infections (URIs) are a viral infection of the air passages leading to the lungs. A URI affects the nose, throat, and upper air passages. The most common type of URI is nasopharyngitis and is typically referred to as "the common cold."

URIs run their course and usually go away on their own. Most of the time, a URI does not require medical attention, but sometimes a bacterial infection in the upper airways can follow a viral infection. This is called a secondary infection. Sinus and middle ear infections are common types of secondary upper respiratory infections.

Bacterial pneumonia can also complicate a URI. A URI can worsen asthma and chronic obstructive pulmonary disease (COPD). Sometimes, these complications can require emergency medical care and may be life threatening.



## CAUSES

Almost all URIs are caused by viruses. A virus is a type of germ and can spread from one person to another.

## RISKS FACTORS

You may be at risk for a URI if:

- You smoke.
- You have chronic heart or lung disease.
- You have a weakened defense (*immune*) system.
- You are very young or very old.
- You have nasal allergies or asthma.
- You work in crowded or poorly ventilated areas.
- You work in health care facilities or schools.

## SIGNS AND SYMPTOMS

Symptoms typically develop 2–3 days after you come in contact with a cold virus. Most viral URIs last 7–10 days. However, viral URIs from the influenza virus (flu virus) can last 14–18 days and are typically more severe. Symptoms may include:

- Runny or stuffy (*congested*) nose.
- Sneezing.
- Cough.
- Sore throat.
- Headache.
- Fatigue.
- Fever.
- Loss of appetite.
- Pain in your forehead, behind your eyes, and over your cheekbones (sinus pain).
- Muscle aches.

## DIAGNOSIS

Your health care provider may diagnose a URI by:

- Physical exam.
- Tests to check that your symptoms are not due to another condition such as:
- Strep throat.
- Sinusitis.
- Pneumonia.
- Asthma.

## TREATMENT

A URI goes away on its own with time. It cannot be cured with medicines, but medicines may be prescribed or recommended to relieve symptoms. Medicines may help:

- Reduce your fever.
- Reduce your cough.
- Relieve nasal congestion.

## HOME CARE INSTRUCTIONS

- Take medicines only as directed by your health care provider.
- Gargle warm saltwater or take cough drops to comfort your throat as directed by your health care provider.
- Use a warm mist humidifier or inhale steam from a shower to increase air moisture. This may make it easier to breathe.
- Drink enough fluid to keep your urine clear or pale yellow.
- Eat soups and other clear broths and maintain good nutrition.
- Rest as needed.
- Return to work when your temperature has returned to normal or as your health care provider advises. You may need to stay home longer to avoid infecting others. You can also use a face mask and careful hand washing to prevent spread of the virus.
- Increase the usage of your inhaler if you have asthma.
- **Do not** use any tobacco products, including cigarettes, chewing tobacco, or electronic cigarettes. If you need help quitting, ask your health care provider.

## PREVENTION

The best way to protect yourself from getting a cold is to practice good hygiene.

- Avoid oral or hand contact with people with cold symptoms.
- Wash your hands often if contact occurs.

There is no clear evidence that vitamin C, vitamin E, echinacea, or exercise reduces the chance of developing a cold. However, it is always recommended to get plenty of rest, exercise, and practice good nutrition.

## SEEK MEDICAL CARE IF:

- You are getting worse rather than better.
- Your symptoms are not controlled by medicine.
- You have chills.
- You have worsening shortness of breath.
- You have brown or red mucus.

Name: HICKMAN, ASHLEY          Page 8          Dec/30/2019 19:53:02
MRN: SSH-000854316

- You have yellow or brown nasal discharge.
- You have pain in your face, especially when you bend forward.
- You have a fever.
- You have swollen neck glands.
- You have pain while swallowing.
- You have white areas in the back of your throat.

## SEEK IMMEDIATE MEDICAL CARE IF:

- You have severe or persistent:
  - Headache.
  - Ear pain.
  - Sinus pain.
  - Chest pain.
- You have chronic lung disease and any of the following:
  - Wheezing.
  - Prolonged cough.
  - Coughing up blood.
  - A change in your usual mucus.
- You have a stiff neck.
- You have changes in your:
  - Vision.
  - Hearing.
  - Thinking.
  - Mood.

## MAKE SURE YOU:

- Understand these instructions.
- Will watch your condition.
- Will get help right away if you are not doing well or get worse.

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Released: 06/13/2002 Document Revised: 01/08/2016 Document Review ed: 03/25/2015

ExitCare® Patient Information ©2016 ExitCare, LLC.

# Sinusitis, Adult

Sinusitis is redness, soreness, and inflammation of the paranasal sinuses. Paranasal sinuses are air pockets within the bones of your face. They are located beneath your eyes, in the middle of your forehead, and above your eyes. In healthy paranasal sinuses, mucus is able to drain out, and air is able to circulate through them by way of your nose. However, when your paranasal sinuses are inflamed, mucus and air can become trapped. This can allow bacteria and other germs to grow and cause infection.

Sinusitis can develop quickly and last only a short time (*acute*) or continue over a long period (*chronic*). Sinusitis that lasts for more than 12 weeks is considered chronic.



Sinuses

## CAUSES

Causes of sinusitis include:

- Allergies.
- Structural abnormalities, such as displacement of the cartilage that separates your nostrils (*deviated septum*), which can decrease the air flow through your nose and sinuses and affect sinus drainage.
- Functional abnormalities, such as when the small hairs (*cilia*) that line your sinuses and help remove mucus do not work properly or are not present.

## SIGNS AND SYMPTOMS

Symptoms of acute and chronic sinusitis are the same. The primary symptoms are pain and pressure around the affected sinuses. Other symptoms include:

- Upper toothache.
- Earache.
- Headache.
- Bad breath.
- Decreased sense of smell and taste.
- A cough, which worsens when you are lying flat.
- Fatigue.
- Fever.
- Thick drainage from your nose, which often is green and may contain pus (*purulent*).
- Swelling and warmth over the affected sinuses.

## DIAGNOSIS

Your health care provider will perform a physical exam. During your exam, your health care provider may perform any of the following to help determine if you have acute sinusitis or chronic sinusitis:

- Look in your nose for signs of abnormal growths in your nostrils (*nasal polyps*).
- Tap over the affected sinus to check for signs of infection.
- View the inside of your sinuses using an imaging device that has a light attached (*endoscope*).

If your health care provider suspects that you have chronic sinusitis, one or more of the following tests may be recommended:

- Allergy tests.
- Nasal culture. A sample of mucus is taken from your nose, sent to a lab, and screened for bacteria.
- Nasal cytology. A sample of mucus is taken from your nose and examined by your health care provider to determine if your sinusitis is related to an allergy.

## TREATMENT

Most cases of acute sinusitis are related to a viral infection and will resolve on their own within 10 days. Sometimes, medicines are prescribed to help relieve symptoms of both acute and chronic sinusitis. These may include pain medicines, decongestants, nasal steroid sprays, or saline sprays.

However, for sinusitis related to a bacterial infection, your health care provider will prescribe antibiotic medicines. These are medicines that will help kill the bacteria causing the infection.

Rarely, sinusitis is caused by a fungal infection. In these cases, your health care provider will prescribe antifungal medicine.

For some cases of chronic sinusitis, surgery is needed. Generally, these are cases in which sinusitis recurs more than 3 times per year, despite other treatments.

## HOME CARE INSTRUCTIONS

- Drink plenty of water. Water helps thin the mucus so your sinuses can drain more easily.
- Use a humidifier.
- Inhale steam 3–4 times a day (for example, sit in the bathroom with the shower running).
- Apply a warm, moist washcloth to your face 3–4 times a day, or as directed by your health care provider.
- Use saline nasal sprays to help moisten and clean your sinuses.
- Take medicines only as directed by your health care provider.
- If you were prescribed either an antibiotic or antifungal medicine, finish it all even if you start to feel better.

## SEEK IMMEDIATE MEDICAL CARE IF:

- You have increasing pain or severe headaches.
- You have nausea, vomiting, or drowsiness.
- You have swelling around your face.
- You have vision problems.
- You have a stiff neck.
- You have difficulty breathing.

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Released: 12/18/2006 Document Revised: 01/08/2016 Document Review ed: 01/01/2013

ExitCare® Patient Information ©2016 ExitCare, LLC.

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge <u>**within 90 days**</u> of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Chicago Direct Dial: (312) 872-9777
Administration Fax: (312) 588-1255
Enforcement/File Disclosure Fax: (312) 588-1260
Federal Sector Fax: (312) 588-1265
Intake FAX: (312) 588-1286
Legal Fax: (312) 588-1494
Mediation Fax: (312) 588-1498
Website: www.eeoc.gov

Dear Charging Party:

Recently, during the COVID-19 pandemic, the Investigator assigned to your charge discussed your allegations with you over the telephone and indicated that a recommendation was being made to management concerning your charge. You were invited to provide any additional information you might have concerning your allegations.

This letter is to advise you that management has considered the Investigator's recommendation, along with any additional information you may have submitted. Your charge is now being dismissed, and you are being issued a Notice of Right to Sue.

The enclosed document entitled "Dismissal and Notice of Rights" explains that, should you wish to pursue the matter in court, *you must file suit within 90 days of your receipt of the enclosed Notice of Right to Sue.*Your charge has been dismissed, because it is our judgment that EEOC cannot prove your allegations given the evidence provided through the course of this investigation. The evidence obtained to date, in addition to our limited resources, does not justify further investigation.

An information sheet is enclosed which describes how you can obtain a copy of your EEOC file and how you can file a lawsuit, should you wish to pursue your claim in court. If you have questions or concerns, you can reach me in writing at the address above or by phone at the number on the Dismissal Notice.

Enclosures

EEOC Form 161 (11/16)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  Ashley D. Hickman                              From:  Chicago District Office
     616 East 90th Place                                   230 S. Dearborn
     Chicago, IL 60619                                     Suite 1866
                                                           Chicago, IL 60604

☐  On behalf of person(s) aggrieved whose identity is
   CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 444-2020-01648 | Seth Sinclair, Investigator | (312) 872-9730 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Julianne Bowman/ti*                                           August 27, 2020

Enclosures(s)                    Julianne Bowman,                    (Date Mailed)
                                 District Director

cc:    Jodi Cook
       Representative
       TARGET CORPORATION
       33 South Sixth Street, CC-3620
       Minneapolis, MN 55402